UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES ALAN CAGLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:15 CV 1087 CDP |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Charles Alan Cagle brings this action under 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's denial of his application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*  Because the Commissioner's final decision is supported by substantial evidence on the record as a whole, I will affirm the decision.

### I.  Procedural History

On June 4, 2012, the Social Security Administration denied Cagle's March 2012 application for DIB, in which he claimed he became disabled on April 15, 2008, because of brain injury, social anxiety, lack of concentration and focus, depression, and short term memory loss.  After Cagle's application was initially denied, a hearing was held before an administrative law judge (ALJ) on November 6, 2013, at which Cagle and a vocational expert testified.  On January 21, 2014, the

ALJ denied Cagle's claim for benefits, finding that Cagle could perform work as it exists in significant numbers in the national economy. On May 14, 2015, the Appeals Council denied Cagle's request for review of the ALJ's decision. The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action for judicial review, Cagle claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Cagle specifically challenges the ALJ's determination of his residual functional capacity (RFC), arguing that the ALJ improperly weighed the medical opinion evidence of record and failed to include all of his limitations in the RFC. Cagle also contends that the ALJ failed to cite medical evidence supporting the RFC determination and, indeed, that no medical evidence supports the ALJ's RFC findings. Cagle also claims that the ALJ improperly found his subjective complaints not to be credible. Cagle requests that the decision of the Commissioner be reversed and that the matter be remanded for an award of benefits or, alternatively, for further evaluation.

For the reasons that follow, the ALJ did not err in his decision.

## II. Testimonial Evidence Before the ALJ

At the hearing on November 6, 2013, Cagle testified in response to questions posed by the ALJ and counsel.

Cagle was fifty-one years old at the time of the hearing. He is a high school graduate and received no other formal education. (Tr. 33.) He lives in a house

with his wife and two-year-old son and is the primary caregiver for his son.  (Tr. 44.)

Cagle worked at Target from June 1995 through April 2008 and was store manager when his employment ended.  He has a pension with Target and negotiated a severance package when he ended his employment.  After leaving Target, Cagle worked for six months in a temporary position as a small parts assembler.  (Tr. 34-36.)  He stopped working in January 2010 because of his impairments and because of the inconsistent nature of the work.  (Tr. 155.)  Cagle testified that he can no longer work because of anxiety and depression.  (Tr. 36, 46-47.)

In 2003, Cagle underwent emergency surgery to relieve pressure on the brain caused by hydrocephalus.  An artery was nicked during the surgery.  (Tr. 35.) Cagle testified that he experienced problems with concentration, motivation, and exhaustion immediately after his surgery, which caused difficulties with his job; but these problems neither improved nor worsened over time.  (Tr. 41.)

Cagle testified that he currently experiences constant low-grade headaches for which he takes over-the-counter medication.  He has not had a serious headache for six or seven months.  His physician will not prescribe narcotic medication for his headaches.  (Tr. 37, 43.)

Cagle testified that he experiences problems with anxiety on a daily basis

and that his brain "goes extremely fast." He constantly feels on edge, has no tolerance for the public, does not go out in public, and does not talk on the telephone. He has difficulty with daily activities and with hobbies because his mind races and he cannot maintain focus. (Tr. 41-42.) Cagle testified that his headaches make his anxiety worse. (Tr. 44.) He testified that he also experiences depression, which is manifested through lack of motivation, avoiding family and friends, and general uncertainty. He testified that he also experiences short-term memory problems, especially with schedules, conversations, and daily activities. (Tr. 42-43.)

Cagle testified that has not seen his psychiatrist for months and was not scheduled to see him until the following year. He testified that he does not need to see his psychiatrist as often as he used to because he was doing better. He takes psychotropic medications, including Seroquel and Cymbalta, but he testified that they make him lightheaded or cause him to faint. (Tr. 39-40, 46.) Cagle testified that his lightheadedness creates difficulty with stooping, kneeling, and crouching. Extreme heat causes him to feel dizzy, disoriented, and weak. (Tr. 48.)

Cagle testified that he passes out with no warning three or four times a month. He continues to drive. (Tr. 38.)

Cagle testified that he was examined at Center Pointe Hospital in February 2013 because of his wife's concern regarding his general health and occasional

drinking.  Cagle testified that he stopped drinking about one year ago.  (Tr. 39.)

As to his daily activities, Cagle testified that his wife leaves for work at 6:00 a.m., after which he and his son awaken.  His day is spent caring for his son and trying to take care of household chores such as dishes, laundry, and cleaning.  He testified that he sometimes has a short fuse with his son's misbehavior but is fortunate that his son is a "very good boy."  (Tr. 44.)  He no longer goes shopping with his wife because he cannot go out in public.  He testified that he drives his wife to and from shopping, but stays in the car while she shops.  He also drives to his parents' home, which is about thirty-five miles away.  Cagle watches a lot of television but does not read because he cannot focus or retain the material.  (Tr. 45-46.)

At the conclusion of Cagle's testimony, the ALJ asked the vocational expert to consider a person of Cagle's age, education, and vocational background, and who had the following limitations:

> lift and carry 20 pounds occasionally, 10 pounds frequently; can stand or walk for six hours out of eight, sit for six; can occasionally climb stairs and ramps, never ropes, ladders and scaffolds; should avoid concentrated exposure to extreme heat, all exposure to unprotected heights, and all exposure to moving and dangerous machinery; and he should not operate motorized vehicles as part of his job. . . . [He] is able to understand, remember and carry out at least simple instructions and non-detailed tasks; can demonstrate adequate judgment to make simple work-related decisions; can respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent; can adapt to routine, simple work changes; should not work in a setting which

includes constant and regular contact with the general public; and
should not perform work which includes more than infrequent
handling of customer complaints.

(Tr. 50.)  The ALJ also instructed the expert to consider that the person required "a

sit/stand option where [he] can change position every 30 minutes but would work a

total of eight hours sitting, standing and walking with normal customary breaks[.]"

(*Id.*)  The expert testified that such a person could not perform Cagle's past

relevant work but could perform other work as a mail sorter and as a marker.  (Tr.

50-51.)

### III.  Medical Evidence Before the ALJ

Cagle was admitted to the emergency room at Progress West Healthcare

Center on January 28, 2008, with complaints of  having a headache for forty-eight

hours with pain at a level nine out of ten.  His history of hydrocephalus,

hypertension, and meningitis was noted and his medications were noted to include

Inderal, Seroquel, and Klonopin.  Physical examination was unremarkable.  A CT

scan of the brain showed post-cranictomy changes with underlying right frontal

tissue loss, and hydrocephalus with similar ventricular size compared to prior

studies.  Cagle was diagnosed with headache and acute sinusitis and was

discharged that same date in stable condition.  He was prescribed Vicodin upon

discharge.  (Tr. 192-212.)

In May 2008, Cagle was admitted to St. Joseph Hospital West with

complaints of chest pain. His history of hydrocephalus was noted, as well as neurosurgical notes indicating that an artery was nicked during related surgery. Cagle reported that he had been reasonably active since that surgery. He reported having no syncopal episodes. It was noted that Cagle had worked at Target for twelve years and was currently looking for another job. He was discharged from the hospital after testing showed that he did not suffer myocardial infarction. (Tr. 219-27, 304.)

Cagle visited Dr. Matthew Beckerdite on November 13, 2008, who noted that he had not seen Cagle in over one year. Cagle reported having chronic headaches that were gradually worsening. He did not experience any dizziness. He also reported having memory problems. Physical examination was normal. Psychological assessment showed Cagle to have normal mood and affect, as well as normal judgment, thought content, and behavior. No depression was noted. Dr. Beckerdite diagnosed Cagle with anxiety, essential hypertension, hyperlipidemia, and acute sinusitis. Laboratory tests were ordered, and an antibiotic was prescribed. (Tr. 306-07.)

Cagle went to the emergency room at St. Joseph Hospital West on May 28, 2009, with complaints of recurrent headaches. His current medications were noted to include Dilacor, Tylenol, Seroquel, and Klonopin. A CT scan of the head was unremarkable when compared with previous studies. Cagle was diagnosed with

high blood pressure and was discharged.  (Tr. 238-59.)

Cagle returned to Dr. Beckerdite on June 26, 2009, who noted him to have had poor follow up and compliance during the previous year.  Cagle reported his hypertension not to be well controlled but that he was feeling well.  He reported that being out of work for fourteen months caused anxiety and stress, but that he had improved with Klonopin and Seroquel.  Cagle was not depressed.  Physical examination was normal.  Psychological assessment showed Cagle to have normal mood and affect, with normal behavior and thought content.  Dr. Beckerdite diagnosed Cagle with essential hypertension, anxiety, and hyperlipidemia.  He adjusted Cagle's medications.  (Tr. 308-10.)

Cagle returned to Dr. Beckerdite in August and reported that decreasing Seroquel rendered him unable to sleep.  He reported having memory loss but had no signs of depression.  He also reported being nervous and anxious and that he had insomnia.  Examination was unremarkable.  Dr. Beckerdite noted Cagle to have elevated triglycerides secondary to Seroquel, and he instructed Cagle to continue to taper off the medication.  (Tr. 311.)

On November 9, 2009, Cagle reported to Dr. Beckerdite that he stopped taking Abilify because he was having suicidal thoughts.[1]  Cagle had stopped Seroquel about one month prior but now had difficulty with insomnia.  He reported

---

[1] There is no indication in the record as to when Abilify was prescribed, or by whom.

having low energy but that he also felt wired, nervous, and on edge. Dr. Beckerdite noted that Cagle no longer saw his psychiatrist. Examination was normal, including neurological and psychological assessments. Dr. Beckerdite diagnosed Cagle with bipolar disorder and Zyprexa was prescribed. He referred Cagle to Dr. Anderson for psychiatric consultation. (Tr. 312.) On November 16, Dr. Beckerdite noted Cagle's bipolar disorder to be improving. Cagle was instructed to continue with his medication. (Tr. 313.) On November 30, Dr. Beckerdite noted that Dr. Anderson restarted Seroquel. Cagle continued to report being anxious and nervous, but psychological assessment was normal. Laboratory testing was ordered. (Tr. 314.)

Cagle next visited Dr. Beckerdite in May 2010 and reported that his hypertension was not well controlled but that he felt well. He reported having memory loss but no longer suffered from insomnia. Cagle denied any depression. Physical and psychological examination was unremarkable. Dr. Beckerdite continued Cagle on his medications, including Seroquel for bipolar disorder. (Tr. 315-16.)

Cagle's next visit with Dr. Beckerdite was on January 27, 2011. He reported that he felt well despite poor control of his blood pressure. He was fatigued but did not experience dizziness, weakness, or loss of consciousness. Cagle reported that he had had a headache for ten days and that over-the-counter medication did not

help. He reported that he has had intermittent headaches since childhood. Cagle also reported feeling anxious and nervous and having memory loss. Physical and psychological examination was normal in all respects. Dr. Beckerdite prescribed Vicodin for headaches. (Tr. 317-18.)

Four days later, on January 31, plaintiff went to the emergency room at St. Joseph Hospital West with complaints of having a headache for one week. He reported having similar headaches twice a year, with each lasting about one week. His current medications were noted to include Vicodin, Bystolic, Dilacor, Tylenol, Seroquel, and Klonopin. Cagle was diagnosed with headaches and was discharged. (Tr. 260-79.) On February 3, Cagle reported to Dr. Beckerdite that his headaches were mild and that he was able to function. Dr. Beckerdite referred Cagle to Dr. Anderson for Seroquel management. (Tr. 319-20.)

Cagle visited Dr. Richard Anderson, a psychiatrist, on March 28, 2011, and reported that his anxiety had worsened and that he does not get out of the house. He also reported his memory to be worsening. Cagle's wife was present and reported that Cagle's anxiety increases the longer he is without a job. Cagle reported that he cannot sleep without Seroquel and that an increased dosage helps him to shut off his brain. He also reported that taking Latuda and Celexa helped reduce his anxiety. Upon review of lab reports, Dr. Anderson instructed Cagle to increase his Celexa, decrease his Latuda and Seroquel, and maintain his Klonopin.

Cagle was instructed to return in four months. (Tr. 337.)

Cagle reported to Dr. Beckerdite on April 4 that he felt well despite not exercising and not adhering to his diet. Cagle denied having any headaches or fatigue. Examination was normal in all respects. Dr. Beckerdite noted that Cagle was being weaned from Seroquel. (Tr. 321.)

Cagle returned to Dr. Beckerdite on July 19 and reported having headaches with associated sensitivity to light. He reported his headaches to come once a month and to last four or five days. He generally takes over-the-counter medication but takes Vicodin for severe headaches. He requested a refill of Vicodin. Cagle reported being depressed, nervous, and anxious but that Seroquel helped his insomnia. Physical and psychological examination was normal. Dr. Beckerdite refilled Cagle's Vicodin prescription. (Tr. 322-32.)

The following week, on July 26, Cagle went to St. Joseph Hospital West with complaints of headaches and heat exposure. He denied any dizziness. He reported the headache pain to be at a level eight and that he felt nauseous. He reported that he was taking acetaminophen for the headache pain. Cagle reported being depressed, but examination showed normal mood, affect, and judgment. His medications were noted to include Bystolic, Seroquel, Klonopin, Celexa, and Tylenol. A CT scan of the head showed no acute change from prior scans. Cagle was given an injection of Dilaudid and Zofran and was discharged that same date.

(Tr. 280-97.)

On August 8, Cagle asked Dr. Beckerdite for more Vicodin to avoid going to the emergency room for severe headaches. He reported having headaches but denied any lightheadedness, dizziness, or syncope. Physical and psychological examination was normal. Dr. Beckerdite prescribed additional Vicodin. (Tr. 324.) On August 29, Dr. Beckerdite referred Cagle to a pain clinic for his chronic headaches. (Tr. 325.) On September 12, Cagle reported to Dr. Beckerdite that he continued to have headaches, but he did not experience dizziness or lightheadedness. (Tr. 326.)

Cagle returned to Dr. Anderson in October 2011 and reported that he had trouble sleeping during the previous month and that he sensed a small boy always at his side. He also reported having headaches since he was about ten years old. Cagle's wife reported a change in personality during the previous month and that Cagle did not feel like getting out and doing things. Dr. Anderson determined that Cagle was having delusions, and he prescribed Zoloft. He also instructed Cagle to increase his dosage of Latuda and to continue with Seroquel and Klonopin as prescribed. (Tr. 338.) On November 21, Cagle reported that he no longer had delusions of a small child. He also reported that the Latuda and Zoloft worked better and he was sleeping better, but that he continued to have anxiety. Dr. Anderson prescribed Valium and instructed Cagle to decrease his Seroquel,

discontinue Klonipin, and continue with Latuda and Zoloft. (Tr. 339.)

Cagle returned to Dr. Anderson on February 21, 2012, and reported that he takes three Valium in the morning for anxiety and that his anxiety decreases during the day. Dr. Anderson instructed Cagle to continue with Seroquel and Valium and to taper Latuda. Cagle's Zoloft was increased. (Tr. 339.)

On May 12, 2012, Cagle underwent a consultative psychological evaluation with David Lipsitz, Ph.D., for disability determinations. (Tr. 340-46.) Dr. Lipsitz noted Cagle's general appearance and attitude to be good and that he was cooperative during the session. Cagle reported having had brain surgery in 2003, which itself caused internal bleeding. He reported that he had not been the same since, with both short-term and long-term memory affected. He also reported having frequent anxiety and panic attacks since the brain trauma. He spends most of his time at home and does not drive anywhere that he is not familiar with for fear of getting lost. Cagle's wife reported that he could not be in a room with a large group of people. Cagle reported that taking Seroquel helps him sleep and that he has a good appetite but that his energy level and interest level have both diminished. He denied any significant mood swings, reporting that he was mostly depressed. He also denied any problems with drugs or alcohol.

Cagle completed the Wechsler Memory Scale during this evaluation, which showed his memory to generally be in the "extremely low" range. Visual working

memory was in the lower part of the "low average" range. Dr. Lipsitz reported that Cagle showed extreme deficiency in auditory and visual memory in both immediate and delayed categories. (Tr. 343.)

Mental status examination showed Cagle not to be in any acute distress. He was oriented in all spheres and showed no evidence of any active psychotic functioning. He had a bright affect but a depressed mood. His intellectual functioning appeared to be within the average range. Remote memory was good but he had problems with memory for recent events. Cagle's concentration was fair, and his insight and judgment were good. Dr. Lipsitz noted Cagle's thought processes to be primarily preoccupied with his memory problems, anxiety, fears, insecurities, and inability to function within society. Dr. Lipsitz diagnosed Cagle with depression secondary to brain trauma, and anxiety disorder with panic attacks. Bipolar disorder was to be ruled out. Dr. Lipsitz assigned a Global Assessment of Functioning (GAF) score of 45. He opined that Cagle had marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; and marked deficiencies in concentration, persistence, or pace. Dr. Lipsitz also opined that Cagle appeared to need ongoing psychiatric treatment with both medication and individual psychotherapy. He further opined that Cagle did not appear able to handle his own financial affairs. (Tr. 341-46.)

On May 31, 2012, Terry Dunn, Ph.D., a psychological consultant with

disability determinations, completed a Psychiatric Review Technique Form (PRTF) in which he opined that Cagle's depression and anxiety disorder caused moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace; with no repeated episodes of decompensation of extended duration. Dr. Dunn opined that the evidence of record, including Dr. Lipsitz's evaluation, did not suggest marked limitations in social functioning or activities of daily living. He further opined that Cagle's memory issues would be the primary variable in work-related functional limitations, precluding complex work. He opined that Cagle may be capable of simple work given his reported level of functioning in activities of daily living. (Tr. 347-58.)

Dr. Dunn completed a Mental RFC Assessment that same date. (Tr. 359-61.) In the domain of Understanding and Memory, Dr. Dunn opined that Cagle was markedly limited in his ability to understand and remember detailed instructions, moderately limited in his ability to remember locations and work-like procedures, and not significantly limited in his ability to understand and remember very short and simple instructions. With Sustained Concentration and Persistence, Dr. Dunn opined that Cagle was markedly limited in his ability to carry out detailed instructions and moderately limited in his ability to sustain an ordinary routine without special supervision, work in coordination with or proximity to

others without being distracted by them, complete a normal workday or workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. In all other respects, Dr. Dunn considered Cagle not to be significantly limited in this domain. With Social Interaction, Dr. Dunn opined that Cagle was moderately limited in his ability to interact appropriately with the general public and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but otherwise was not significantly limited. With Adaptation, Dr. Dunn opined that Cagle was moderately limited in his ability to respond appropriately to changes in the work setting and to travel in unfamiliar places/use public transportation, but otherwise was not significantly limited. Dr. Dunn concluded that Cagle must avoid work involving multi-step instructions and multi-tasking activities but was capable of understanding and remembering instructions, carrying out, and persisting at simple tasks. Dr. Dunn further concluded that Cagle was capable of

> making simple work-related judgments, relating at an adequate level
> to co-workers and supervisors, and adjusting adequately to the
> common type of changes in work routine or setting. He would be best
> suited to a work setting which does not involve repeated or prolonged
> exposure to large groups of people (public or co-workers) in order to
> reduce stress and anxiety. [He] would require additional supervision
> and repetition of instruction during the orientation and training phase
> of employment.

(Tr. 361.)

Cagle visited Dr. Anderson on May 31, 2012, and reported having had a

rough couple of weeks. It was noted that Cagle's wife worked and that he took care of their nine-month-old baby, which Cagle reported was not difficult. He reported his social anxiety to be worsening and that he had difficulty going shopping or to the barber. He reported that the Valium he takes in the morning wears off too soon. Dr. Anderson instructed Cagle to increase his Valium and to continue with Zoloft and Seroquel as prescribed. (Tr. 373.)

Cagle next visited Dr. Anderson on August 23 and reported that his anxiety had not changed. He reported taking all of his prescribed Valium in the morning, which is when his anxiety is at its worst. Dr. Anderson noted Cagle to stay home with his child. He instructed Cagle to taper and then stop Zoloft, and to start Cymbalta. He further instructed Cagle to continue with Seroquel and Valium as prescribed. (Tr. 373.)

Cagle visited Dr. Beckerdite on August 27, who noted Cagle's compliance with his treatment plan for dyslipidemia to be inadequate and that he rarely exercised. Cagle reported feeling well with respect to his hypertension, but he continued to report chronic headaches for which he took over-the-counter medication, with a need for Vicodin for severe headaches. He denied experiencing any dizziness or lightheadedness. Physical and psychological examination was normal. Dr. Beckerdite noted Cagle to have normal mood and affect. Dr. Beckerdite refilled Cagle's Vicodin prescription, but instructed that the

prescription was to cover for the next twelve months.  (Tr. 368-69.)

Cagle went to the emergency room at St. Joseph Hospital West on October 29, 2012, for headache pain lasting four days.  He reported the pain to be at a level nine.  He did not experience any associated syncope, shortness of breath, or dizziness.  He reported that he drank socially, about four glasses of wine per week.  He reported no depressive symptoms.  His mood, affect, and judgment were normal.  Physical examination was normal in all respects.  Testing showed no acute abnormalities.  Cagle was given Dilaudid, which provided little relief.  With additional medication, Cagle felt better and was discharged with a diagnosis of headache.  (Tr. 382-91.)

On November 1, plaintiff reported to Dr. Beckerdite's nurse practitioner that he had had a headache for over one year.  He described the headache as a squeezing sensation in the bilateral frontal and temporal area and that he takes several Vicodin to relieve the pain.  He denied any dizziness or weakness.  He reported that he does not go to a specialist for the condition because of his unemployment and lack of finances.  Cagle appeared distressed, but his examination was otherwise normal.  The NP noted that Dr. Beckerdite did not want Cagle to be treated with Vicodin, and Midrin was prescribed.  (Tr. 367.)

Cagle's wife contacted Dr. Anderson on November 8, requesting an urgent visit.  She reported that Cagle drinks half a bottle of whiskey daily and calls her

repeatedly at work when he is drunk. She reported that he was in denial about the drinking and that his memory was impaired. (Tr. 373.) Dr. Anderson saw Cagle the following day. Cagle reported that he had increased anxiety but had taken all of his Valium, so he started drinking more. He reported having suicidal thoughts but stated that he would not follow through because of his family. Cagle reported that he had not had a drink in twenty-four hours. Dr. Anderson noted Cagle to experience withdrawal symptoms and recommended that he participate in an intensive outpatient program (IOP) for alcohol treatment. Cagle stated that he did not want to go. Dr. Anderson prescribed Librium and instructed Cagle to increase his Seroquel and Cymbalta and to discontinue Valium. He instructed Cagle to return in six weeks. (Tr. 372.)

Cagle went to the emergency room at St. Joseph Hospital West on December 19 with complaints of gastrointestinal bleeding, headaches, and lightheadedness. He reported having passed out three times over the past few days. He continued to report that he drank socially, about four glasses of wine per week. No depressive symptoms were noted. Examination showed Cagle to be fully oriented and in no distress. He was given Zofran and Dilaudid. Improvement was noted after medication and fluids, and Cagle was discharged. (Tr. 392-96.)

On December 28, plaintiff visited Dr. Beckerdite and reported that he recently became lightheaded and slipped, striking his right side. He was noted to

be anxious and nervous, but no depressive features were observed.  Dr. Beckerdite gave Cagle treatment recommendations for right rib pain.  (Tr. 363-64.)

Cagle returned to St. Joseph's emergency room on January 3, 2013, with complaints of having syncopal episodes for over two weeks.  With his report of continued gastrointestinal bleeding, he was admitted to the hospital.  It was thought that Cagle's syncopal episodes were likely related to the bleed.  Cagle reported that he drank about a liter of bourbon a week.  His history of headaches was noted, and CT scans showed normal pressure hydrocephalus or aqueductal stenosis.  Cagle was given Dilaudid and Ultram for pain control.  After receiving additional fluids and treatment for his GI condition, he was discharged on January 5.  (Tr. 397-408.)

Cagle contacted Dr. Anderson on January 15 and reported that he had passed out more than five times during the previous six weeks, with the most recent episode occurring the night before.  Dr. Anderson instructed Cagle to contact his primary care physician and to decrease his Cymbalta.  (Tr. 372.)

Cagle returned to St. Joseph's emergency room on February 9 for evaluation of a syncopal episode that occurred the previous day.  He underwent a neurological consult for syncope, daily tension headaches, and repeated concussions from falls. He currently had no headache.  It was noted that Cagle exhibited drug-seeking behavior during his January hospitalization.  CT scans showed no significant change from previous studies.  Additional tests and studies were ordered, but there

is no indication in the record that they were performed.  Cagle was discharged the following day.  (Tr. 409-14.)

On February 13, Cagle was evaluated at Center Pointe Hospital for IOP treatment of alcoholism and depression, and for medication management.  It was noted that he had been drinking a quarter to a half of a fifth of whiskey every night for the past ten years and had been drinking beer for ten years prior to that.  Cagle reported having symptoms of withdrawal, including tremors, when he does not drink.  He also reported that he drinks while taking medications, which was noted to cause several interactions, including fainting.  Cagle reported having a depressed mood and increased anxiety since his head injury eight years prior.  He reported feeling hopeless and helpless.  Mental status exam showed Cagle's mood to be down and stressed, and his affect was anxious and flat.  His speech was normal, and his thought process was logical and goal-directed.  He was oriented times four, and his remote and recent memory were noted to be intact.  His insight was fair and his judgment was moderately impaired.  Cagle was diagnosed with alcohol dependence and depressive disorder and was assigned a GAF score of 43.  It was noted that Cagle would not be admitted for IOP treatment without first completing an inpatient detoxification program, but Cagle was unwilling to do this.  (Tr. 376-80.)

Cagle visited Dr. Phillip L. Brick on February 28 for examination related to

hypertension, hyperlipidemia, and depressive symptoms.  Dr. Brick noted Cagle's

hypertension and hyperlipidemia to be well controlled and his depression to be

improving with medication.  Cagle's medications included Cymbalta, Excedrin

Migraine, and Seroquel.  Cagle reported that he drinks alcohol every day and that

he has episodes of syncope without warning.  Physical examination was

unremarkable.  Mental status examination showed Cagle to be fully oriented, and

his memory was intact with both long-term recall and immediate recall.  Cagle's

attention and concentration were normal, and his fund of knowledge was within

normal limits.  His judgment and insight were intact.  His mood and affect were

normal, and his thought processes were normal and logical.  Dr. Brick ordered

laboratory tests and instructed Cagle to exercise and reduce his caloric intake.  (Tr.

423-27.)

On March 28, Cagle reported to Dr. Anderson that he had had no alcohol for

one month and that his medications appeared to be working "amazingly good."

Dr. Anderson instructed Cagle to continue with Cymbalta and Seroquel.  (Tr. 371.)

Cagle returned to Dr. Brick on April 4 for follow up of his hypertension.  Dr.

Brick noted the condition to be well controlled and that Cagle was compliant with

medication.  Cagle reported that he had been able to wean Seroquel down to only

one pill and that he had significantly reduced his drinking.  His mood was noted to

be normal and his affect appropriate.  Physical examination was normal in all

respects. Dr. Brick instructed Cagle to return in three months. (Tr. 428-30.)

On July 16, Dr. Brick noted Cagle's hypertension to be well controlled, but Cagle reported having a headache for five days. Physical examination was normal in all respects. Cagle's mood was normal and his affect was appropriate. Dr. Brick prescribed Norco for pain. (Tr. 431-34.) Plaintiff continued to complain of headaches on August 15. Physical and psychological exams were unchanged. Dr. Brick ordered laboratory and diagnostic tests, and hydrochlorothiazide was prescribed. (Tr. 435-38.)

On September 5, Cagle reported to Dr. Anderson that he was not drinking and that his anxiety had decreased. Dr. Anderson noted Cagle's mood to have improved and that he was doing well. He instructed Cagle to continue with his medications and to return in six months for follow up. (Tr. 371.)

Cagle returned to Dr. Brick on September 10, who noted that Cagle had a new diagnosis of diabetes. Cagle had no additional complaints, although he reported being fatigued. Physical and psychological examination was normal. Dr. Brick diagnosed Cagle with hypertension, hyperlipidemia, depressive disorder, tension headache, and diabetes mellitus. He prescribed medication for diabetes and hypertension and instructed Cagle to return in one month. (Tr. 441-43.)

In a Physical Medical Source Statement (MSS) completed September 26, 2013, Dr. Brick opined that Cagle could frequently lift and carry up to twenty-five

pounds and occasionally lift and carry up to fifty pounds; could stand or walk continuously for one hour and for a total of four hours throughout an eight-hour workday; and could sit continuously for three hours and for a total of four hours throughout an eight-hour workday. He opined that Cagle was limited in his ability to push or pull because of concentration issues and that he had possible limitations in concentration, persistence, and pace caused by side effects of Seroquel or Cymbalta. Dr. Brick opined that Cagle could never stoop, kneel, crouch, or crawl, but could occasionally or frequently engage in all other postural activities. He further opined that Cagle should avoid any exposure to extreme heat and avoid moderate exposure to extreme cold. (Tr. 415-16.)

In a Mental MSS completed that same date, Dr. Brick opined that, in the domain of Understanding and Memory, Cagle was extremely limited in his ability to remember locations and work-like procedures, markedly limited in his ability to understand and remember detailed instructions, and moderately limited in his ability to understand and remember very short and simple instructions. In the domain of Sustained Concentration and Persistence, Dr. Brick opined that Cagle was extremely limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerance, work in coordination with or proximity to others without being distracted by them,

complete a normal workday and workweek without interruption from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. He further opined that Cagle was moderately limited in his ability to carry out very short and simple instructions, sustain an ordinary routine without special supervision, and make simple work-related decisions. In the domain of Social Interaction, Dr. Brick opined that Cagle was markedly limited in his ability to interact appropriately with the general public and moderately limited in his ability to ask simple questions or request assistance, accept instructions, and respond appropriately to criticism from supervisors. In the domain of Adaptation, Dr. Brick opined that Cagle was extremely limited in his ability to travel in unfamiliar places or use public transportation; and moderately limited in his ability to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others. (Tr. 417-18.)

## IV.  The ALJ's Decision

The ALJ found that Cagle met the insured status requirements of the Social Security Act through December 31, 2013, and had not engaged in substantial gainful activity since April 15, 2008, the alleged onset date of disability. The ALJ found Cagle's history of hydrocephalus with headaches, history of syncopal episodes, obesity, anxiety, and depression to be severe impairments, but that Cagle

did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13-16.)

The ALJ determined that Cagle had the RFC to perform light work but with the following limitations:

> occasionally climb stairs or ramps, never ropes, ladders or scaffolds; should avoid concentrated exposure to extreme heat; should avoid all exposure to unprotected heights and moving and dangerous machinery; should not operate a motorized vehicle as part of his work; is able to understand, remember, and carry out at least simple instructions and non-detailed tasks; can demonstrate adequate judgment to make simple work related decisions; can respond appropriately to supervisors and coworkers in a task oriented setting where contact with others is casual and infrequent; can adapt to simple routine work changes; should not work in a setting that requires constant regular contact with the general public; should not work in a setting that includes more than infrequent handling of customer complaints; and must have the ability to alternate between sitting, standing and walking with a change of position every 30 minutes (for a total of eight hours during the work day of sitting, standing, and walking).

(Tr. 16.) The ALJ found Cagle unable to perform his past relevant work. (Tr. 25.)

Considering Cagle's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that Cagle could perform other work as it exists in significant numbers in the national economy, and specifically, mail sorter and marker. The ALJ thus found Cagle not to be under a disability from April 15, 2008, through the date of the decision. (Tr. 25-27.)

## V. Discussion

To be eligible for DIB under the Social Security Act, Cagle must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's

impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, I must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). I must also consider any evidence that fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

Cagle challenges the manner and method by which the ALJ made his RFC determination. Cagle specifically claims that the ALJ improperly accorded little weight to Drs. Lipsitz's and Brick's opinions and improperly gave weight to Dr. Dunn's opinion; that the ALJ erred in discounting his subjective complaints; and that the ALJ's RFC determination is not supported by the medical evidence of record and, indeed, that the evidence shows additional limitations. For the following reasons, the ALJ did not err in his determination.

A.     Weight Accorded to Medical Opinion Evidence

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. *See* 20 C.F.R. § 404.1527(e)(2)(ii).

The opinions of treating physicians are generally given more weight than other sources. 20 C.F.R. § 404.1527(c)(2). When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion. *Id.* Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. *Id.* The Regulations provide that the Commissioner "will always give good reasons in [the]

notice of determination or decision for the weight [given to the] treating source's opinion." *Id.*

Here, the ALJ considered the § 404.1527 factors and determined to accord little weight to Dr. Brick's September 2013 Medical Source Statements. The ALJ specifically noted that Dr. Brick had only recently begun treating Cagle and was a general physician who did not specialize in treating brain injuries or in psychiatric care and treatment. The ALJ also noted that Dr. Brick did not provide any medical support for his findings, other than that Cagle's concentration may be affected by his medications. These reasons to accord little weight to the opinion are based on the relevant factors and are supported by substantial evidence in the record. The ALJ also noted that the extreme limitations set out in Dr. Brick's Mental MSS were inconsistent with his own treatment records, which repeatedly showed Cagle to exhibit normal neurological and psychological behaviors. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." *Davidson v. Astrue,* 578 F.3d 838, 842 (8th Cir. 2009); *see also Hacker v. Barnhart,* 459 F.3d 934, 937 (8th Cir. 2006). The ALJ did not err in according little weight to Dr. Brick's opinion.

Nor did the ALJ err in according little weight to Dr. Lipsitz's May 2012 opinion. As noted by the ALJ, Dr. Lipsitz did not have a treating relationship with Cagle and based his opinion on a one-time evaluation. He did not have access to

any of Cagle's treatment records or function reports and appeared to base his opinion on subjective statements made by Cagle and his wife. *See Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010) (in weighing medical opinion evidence, ALJ may consider the extent to which consulting physician had access to relevant medical records). The ALJ noted that Dr. Lipsitz's opinion of marked limitations in all domains of functioning was inconsistent with Cagle's self-reported activities of providing all-day care for his infant child; performing household chores such as cleaning, laundry, and mowing; going shopping as needed for formula and other necessities; performing online banking by paying bills, managing a savings account, and using a checkbook; and regularly going to Walgreens and the bank. (*See* Tr. 143-50.) Where a medical source's opinion is inconsistent with evidence of a claimant's actual activities, an ALJ does not err in according little weight to that opinion. *See Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005) (substantial evidence supported ALJ's decision to discount physician's opinion given that claimant's actual behavior was clearly at odds with limitations described by the medical source).

The ALJ accorded some weight to Dr. Dunn's opinion, finding other evidence of record to support his conclusions of moderate limitations. As summarized by the ALJ, other evidence included Cagle's self-reported activities of daily living, as described above, which the ALJ concluded showed Cagle's ability

to attend to his surroundings, persist in completing tasks, and engage in public activities when necessary. The ALJ also summarized evidence that showed Cagle to continually exhibit normal psychological behaviors during numerous examinations with various physicians, including treating physicians and hospital personnel. Isolated exacerbations of symptoms were met with adjustments to medication, to which Cagle responded favorably. The ALJ's summary of evidence also included Cagle's complaints to his physicians that he experienced memory loss, but that clinical examinations showed Cagle's immediate and long-term memory to be intact. Because this other evidence of record is consistent with Dr. Dunn's opinion, the ALJ did not err in according some weight to the opinion. *Hacker*, 459 F.3d at 939.

Cagle contends that the ALJ should have accorded no weight to Dr. Dunn's opinion, arguing that it was internally inconsistent. This perceived inconsistency is between Dr. Dunn's finding that Cagle was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace, and his silence on the matter in his narrative functional capacity assessment. As noted by the Commissioner, however, Dr. Dunn's narrative conclusion was made on that part of the PRTF that instructed the consultant to "elaborat[e] on the preceding capacities" and to "[i]nclude any information which clarifies limitation or

function." (*See* Tr. 361.) Dr. Dunn's failure to clarify or elaborate on a previous specific finding does not render his overall opinion inconsistent.

Cagle also contends that if the weight accorded to Dr. Dunn's opinion was proper, then the RFC should have included the conclusion that Cagle would require "additional supervision and repetition of instruction during the orientation and training phase of employment." The ALJ, however, did not give great or substantial weight to Dr. Dunn's opinion; only some weight. Nevertheless, regardless of the weight accorded to this opinion, the ALJ was not required to adopt the opinion in its entirety. *See Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). Instead, he was required to base his determination upon a review of the record as a whole. *Id.* This is precisely what he did.

In summary, the ALJ did not err in weighing the opinion evidence of Drs. Brick, Lipsitz, and Dunn in this action.

B.    Credibility Determination

When evaluating a claimant's credibility, the ALJ must consider all evidence relating to the claimant's complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir.

2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). While an ALJ need not explicitly discuss each *Polaski* factor in his decision, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints. *Wildman,* 596 F.3d at 968. Where an ALJ considers the *Polaski* factors and explicitly discredits a claimant's complaints for good reason, I should defer to that decision. *Halverson,* 600 F.3d at 932. The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. *Tellez,* 403 F.3d at 957; *Pearsall*, 274 F.3d at 1218.

Discussing the *Polaski* factors here, the ALJ set out numerous inconsistencies in the record from which he determined Cagle's subjective complaints of disabling symptoms not to be credible. Cagle claims that the ALJ's analysis of his daily activities and work history is flawed, rendering the adverse credibility determination unsupported by substantial evidence. I disagree.

Cagle first claims that the ALJ erred by finding his daily activities of caring for his child, performing housework, and traveling to the store not to be as limiting as one would expect, arguing that the Eighth Circuit has found these activities not to be inconsistent with disabling symptoms. The ALJ, however, explained why these activities were inconsistent with Cagle's claim of disabling symptoms, namely, that Cagle cared for his infant son *without assistance*, which the ALJ observed to be physically and emotionally demanding; that he engaged in

*physically demanding* household chores; and that he traveled to the store *with his infant son* to shop for necessities. *E.g., Halverson,* 600 F.3d at 933 (shopping trips inconsistent with claim of being unable to leave the house); *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009) (ability to care for two four-year-old sons with illnesses inconsistent with claim of disabling symptoms, including frequent anxiety attacks and short term memory problems); *Brewster v. Barnhart*, 366 F. Supp. 2d 858, 873 (E.D. Mo. 2005) (ability to be primary caregiver for two minor children and engage in household chores inconsistent with claim of disabling depression).

Regardless, the ALJ did not discredit Cagle on account of his daily activities but instead considered his "limited daily activities . . . to be outweighed by the other factors discussed in this decision." (Tr. 21.) An ALJ is permitted to consider the strength of one *Polaski* factor against inconsistencies in the record relating to the other factors. *See Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996). Because the ALJ determined the strength of Cagle's daily activities not to outweigh the other inconsistencies in the record, he did not err in his overall finding that Cagle's subjective complaints were not credible. *Id.*

Cagle also claims that the ALJ improperly evaluated his work record by failing to consider his extensive work history predating the alleged onset date of disability and, further, by focusing on his minimal work activity after the alleged onset date. As an initial matter, I note that the ALJ was not required to discuss

each *Polaski* factor in his decision, so his failure to expressly address Cagle's work history prior to the alleged onset of disability does not render the credibility determination inadequate. *Buckner v. Astrue*, 646 F.3d 549, 558-59 (8th Cir. 2011); *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). Nor does the ALJ's consideration of Cagle's post-disability work activity render his credibility determination flawed. The ALJ did not consider this work activity as evidence that Cagle is able to perform substantial gainful activity or that he maintains an ability to work. Instead, the ALJ considered this activity in determining the extent to which Cagle engaged in daily activities, "at least at times." (Tr. 21.) An ALJ is permitted to consider limited work activity in this context. *See Choate v. Barnhart*, 457 F.3d 865, 871 (8th Cir. 2006).

An ALJ must assess a claimant's credibility based upon a review of the record a whole. Where such review shows the claimant not to be as limited as his testimony would suggest, the ALJ does not err in discrediting the testimony. *See Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010). A review of the ALJ's decision here shows that he considered the entirety of the record, including testimony and reports obtained from Cagle and third parties, and identified numerous inconsistencies that detracted from Cagle's credibility. Because the ALJ's determination not to credit Cagle's subjective complaints is supported by good reasons and substantial evidence, I will defer to this determination. *See Renstrom*

*v. Astrue,* 680 F.3d 1057, 1065-67 (8th Cir. 2012).

C.    Evidence Supporting RFC Determination

A claimant's RFC is what he can do despite his limitations. *Dunahoo v. Apfel,* 241 F.3d 1033, 1039 (8th Cir. 2001). The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005); *Eichelberger v. Barnhart,* 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 404.1545(a). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Eichelberger*, 390 F.3d at 591; *Hutsell v. Massanari*, 259 F.3d 707, 711-12 (8th Cir. 2001). Accordingly, the record must contain medical evidence sufficient to determine the claimant's RFC at the time of the hearing. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). While the responsibility for determining RFC rests with the ALJ, the claimant nevertheless retains the burden to prove his RFC. *Eichelberger*, 390 F.3d at 591; *Baldwin v. Barnhart,* 349 F.3d 549, 556 (8th Cir. 2003); *Pearsall*, 274 F.3d at 1217-18.

Here, the ALJ thoroughly discussed the medical evidence of record, including the diagnostic and clinical examinations relating to Cagle's severe impairments and their effect on his ability to function. The ALJ specifically

discussed medical evidence that showed Cagle's headaches to be effectively managed with medication, whether over-the-counter or prescription, depending on the severity; and anxiety that improved with medication and did not cause Cagle to exhibit anything other than essentially normal behaviors during mental status examinations. In evaluating the medical evidence, the ALJ accorded appropriate weight to the opinion evidence for the reasons stated earlier.

The ALJ also discussed the nonmedical evidence of record. He specifically addressed Cagle's testimony and the observations made by Cagle's wife. He further noted Cagle's daily activities, including his ability to provide all-day care to his young son and to manage his household by performing chores, shopping for necessary items, and maintaining banking responsibilities. In addition, the ALJ thoroughly analyzed Cagle's subjective complaints and the consistency of such complaints with other evidence of record.

Upon conclusion of his discussion of specific medical facts, nonmedical evidence, and the consistency of such evidence when viewed in light of the record as a whole, the ALJ assessed Cagle's RFC based on the relevant, credible evidence and set out Cagle's limitations and their effect on his ability to perform work-related activities. *See* Social Security Ruling (SSR) 96-8p, 1996 WL 374184 (Soc. Sec. Admin. July 2, 1996). This RFC is supported by substantial evidence on the record as a whole, including medical evidence. I therefore reject Cagle's argument

that no evidence supported the RFC determination or that the ALJ failed to discuss the medical evidence of record.

Cagle also argues that the ALJ should have included his memory problems in the RFC. A review of the RFC, however, shows that the ALJ in fact did so. As set out above, there was conflicting evidence in the record concerning the extent of Cagle's claimed memory problems, including Cagle's subjective statements of poor memory, Dr. Lipsitiz's evaluation showing memory impairment, and several medical notations recording an intact memory. It is the ALJ's function to weigh and resolve conflicts in the evidence of record, including medical evidence. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (citing *Estes,* 275 F.3d at 725). In his decision, the ALJ specifically addressed Cagle's claimed memory impairment and stated that he considered the impairment in determining Cagle's RFC. (Tr. 24.) This RFC included limitations to simple work with simple instructions and non-detailed tasks; limitations to work in a task-oriented setting with only infrequent contact with others; and limitations to work that had only simple, routine changes. To the extent the record demonstrates Cagle to have a memory impairment, these limitations adequately account for related problems. *See, e.g., Martise*, 641 F.3d at 926 (RFC limitations to simple instructions and non-detailed tasks in a low stress environment without public contact shows ALJ considered medical opinion that included finding that claimant had memory problems). Cagle's claim that the RFC

failed to include limitations relating to his memory impairment is without merit.

The ALJ properly established Cagle's RFC based upon all the record evidence in this case, including medical and testimonial evidence. Because the record contains some medical evidence that supports the RFC and substantial evidence on the record as a whole supports the determination, the ALJ did not err. *Baldwin*, 349 F.3d at 558; *Dykes v. Apfel*, 223 F.3d 865, 866-67 (8th Cir. 2000) (per curiam).

## VI. Conclusion

When reviewing an adverse decision by the Commissioner, my task is to determine whether the decision is supported by substantial evidence on the record as a whole. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001). "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion." *Id.* For the reasons set out above on the claims raised by Cagle on this appeal, a reasonable mind can find the evidence of record sufficient to support the ALJ's determination that Cagle was not disabled from April 15, 2008, through the date of the decision. I must therefore affirm the decision. *Id.* I may not reverse the decision merely because substantial evidence exists that may support a contrary outcome.

Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**AFFIRMED**, and plaintiff Charles Alan Cagle's Complaint is dismissed with prejudice.

A separate Judgment is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 8th day of September , 2016.